**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALLEN C. FAINT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13-CV-591 NAB |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision finding Allen C. Faint, who had previously been

found disabled, to have sustained medical improvement such that he was no longer

disabled. All matters are pending before the undersigned United States Magistrate

Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). For the reasons

set forth below, the Commissioner's decision is affirmed.

## I. Procedural History

On October 15, 1999, the Social Security Administration (SSA) awarded

plaintiff Allen C. Faint child disability benefits, finding plaintiff to be disabled as

of October 26, 1998, when he was six years of age. On March 6, 2003, the SSA

determined that plaintiff's disability continued on account of his medically

determinable severe impairments of anxiety disorder and learning disorder.  When

plaintiff attained eighteen years of age, the SSA informed him that his disability

status would be reviewed to determine if he continued to be disabled.  Plaintiff was

advised that such review would be under rules used to determine adult disability on

new claims.  (Tr. 66-67.)  In a letter dated October 7, 2010, the SSA notified

plaintiff that it had determined that, as of that date, he was no longer qualified for

SSI benefits under the definition of disability for adults.  (Tr. 68-71.)  Upon

plaintiff's request for reconsideration, the matter was presented to a Disability

Hearing Officer who conducted a hearing on January 14, 2011, at which plaintiff

was present.  (Tr. 75-86.)  The hearing officer issued a written decision on

February 16, 2011, finding plaintiff no longer eligible for payments.  (Tr. 63-65,

87-93.)  At plaintiff's request, a hearing was held before an Administrative Law

Judge (ALJ) on December 9, 2011, at which plaintiff and a vocational expert

testified.  (Tr. 25-53.)  On January 13, 2012, the ALJ issued a decision in which he

determined plaintiff's disability to have ended on October 7, 2010, and that

plaintiff had not become disabled since that time.  (Tr. 7-19.)  On January 28,

2013, the Appeals Council denied plaintiff's request for review of the ALJ's

decision.  (Tr. 1-5.)  The ALJ's determination thus stands as the final decision of

the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's

decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ erred in failing to find that his cognitive impairments met Listing 12.05(C)'s criteria for mental retardation. Plaintiff also claims that the ALJ erred in his determination of plaintiff's residual functional capacity (RFC) by failing to include limitations relating to concentration, persistence, and pace and by failing to include limitations as observed by third parties. Finally, plaintiff contends that the ALJ failed to properly consider his hearing impairment. Plaintiff requests that the matter be reversed and remanded to the Commissioner for a reinstatement of benefits or for further proceedings.

## II. Testimonial Evidence Before the ALJ

A.    <u>Plaintiff's Testimony</u>

At the hearing on December 9, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was nineteen years of age. Plaintiff attained eighteen years of age on May 8, 2010. Plaintiff graduated from high school and was currently attending community college. Plaintiff currently lived with his father and sister. Plaintiff's mother was deceased. (Tr. 28-29, 37.) Plaintiff testified that he was not currently working and had never had a job outside his home. (Tr. 31.)

Plaintiff testified that he attended special education classes in high school

because of his hearing loss.  (Tr. 29.)  Plaintiff testified that he did not participate in any extracurricular activities.  Plaintiff testified that he was not involved in any fights while in school but had problems getting along with some students because of his inability to understand them.  Plaintiff testified that he currently had no problems with other students at the community college.  (Tr. 35.)

Plaintiff testified that he was currently enrolled in reading, math, and English classes and attended school four days a week.  Plaintiff testified that he had not yet received final grades in his classes but obtained low scores on his midterm exams.  (Tr. 29, 36.)  Plaintiff testified that his hearing loss created difficulty at school, requiring him to repeatedly ask questions of all of his teachers.  Plaintiff testified that he is allowed to sit closer to the teachers because of the problem but receives no other help.  (Tr. 32-33.)

Plaintiff testified that he also suffers from anxiety, which causes him to feel nervous and have difficulty speaking in front of a crowd or being in a crowd of unfamiliar people.  (Tr. 31, 33.)  Plaintiff testified that he has had such difficulties since the second or third grade but was currently not seeing any doctor for the condition.  Plaintiff testified that he does not take prescribed medication for the condition because of side effects, such as headaches.  (Tr. 33-34, 38.)

Plaintiff testified that he has also been diagnosed with attention deficit hyperactivity disorder (ADHD) for which he previously took medication.  Plaintiff

testified that he stopped taking the medication because it caused headaches. Plaintiff testified that he continues to have problems with focus, concentration, and memory and has difficulty comprehending what others tell him. Plaintiff testified that he needs people to repeat things so that he can understand. Plaintiff testified that he can focus on one task for about ten minutes before needing to take a break. (Tr. 39-40.)

Plaintiff testified to being unaware as to whether he had ever been diagnosed with mild mental retardation. Plaintiff testified that he took an IQ test with a consultative examiner and had difficulty following the instructions. (Tr. 41.)

As to his daily activities, plaintiff testified that he drives himself back and forth to school and that his father sometimes drives him. (Tr. 35-36.) Plaintiff testified that when school concludes for the day, he comes home and does household chores or his homework. Plaintiff testified that his chores include taking out the trash, doing the dishes, sweeping, and mowing the lawn. Plaintiff testified that he spends at least four hours every day doing homework. Plaintiff testified that he spends time with friends on the weekends. Plaintiff testified that he also watches television, listens to the radio, and talks on the telephone to friends and family. (Tr. 36-38.)

B.    <u>Testimony of Vocational Expert</u>

Jim Israel, a vocational expert, testified at the hearing in response to

questions posed by the ALJ and counsel.

The ALJ asked Mr. Israel to consider an individual who had been diagnosed with mild mental retardation and who had the following IQ scores: verbal 72, performance 67, low scale 67, working memory 71, and processing speed 67. Mr. Israel testified that such a person may be competitively employed as a food service worker, dishwasher, cleaner, sorter, assembler, packer, or wrapper. (Tr. 45-46.)

The ALJ then asked Mr. Israel to consider the same person but that he has hearing loss in one ear, good hearing in the other ear, would probably have problems hearing things if people were behind him speaking or if there were noises behind him, but could hear things adequately if he was in front of a person. Mr. Israel testified that such consideration must be made on a case-by-case basis but that sixty-five to seventy percent of the sorter jobs, assembler jobs, and packer jobs would continue to be available as well as many dishwasher jobs and some cleaning jobs. (Tr. 46-48.) Mr. Israel testified that for such a person, who had no exertional restrictions, there were 8,500 packer and wrapper jobs in the State of Missouri; 7,100 assembler jobs; 3,500 sorter jobs; 2,100 product inspector jobs; 5,500 dishwasher jobs; and 17,500 cleaning jobs. (Tr. 47-49.)

The ALJ then asked Mr. Israel to define the level of social interaction required by such jobs, to which Mr. Israel responded that about eighty percent of the sorter, assembler, packer, and wrapper jobs involved a minimal amount of

social interaction; that dishwasher jobs are primarily independent and are not social-oriented jobs; and that many cleaning jobs are likewise independent. (Tr. 49-51.)

Finally, the ALJ asked Mr. Israel to consider the person to have significant problems with anxiety affecting his productivity, such that he had problems sometimes following instructions, would not be able to maintain a level of continuous productivity, and had problems focusing. Mr. Israel testified that such a person could not perform any work in a competitive setting. (Tr. 51.)

Plaintiff's counsel then asked Mr. Israel to assume an individual who needed to have instructions repeated on a continuous basis, needed to revisit a task, or needed some sort of oversight. Mr. Israel responded that the need to repeat basic instructions could create a problem with simple, routine, and repetitive work. With respect to being off task, Mr. Israel testified that such a person may not be able to retain their job if their production is significantly lower than what is expected of other workers. (Tr. 51-53.)

### III. Record Evidence Before the ALJ

A. <u>School Records</u>

A Screening/Evaluation Plan from the Special School District dated October 1998, showed plaintiff – who was in the first grade – to have suspected problems in the areas of academics, social/emotional/behavioral, and language. Plaintiff was

noted to have severe hearing loss in the left ear and mild cerebral palsy. No problems were suspected in the areas of health, motor skills, intellectual/cognitive, or adaptive behavior. (Tr. 191-92.)

In December 1998, the Special School District summarized plaintiff's performance and teacher observations and diagnosed plaintiff with language impairment and learning disabled in reading and math calculation. It was noted that plaintiff was also participating in occupational therapy. It was noted that plaintiff underwent Stanford-Binet cognitive testing in April 1997, the results of which showed average intellectual functioning as demonstrated by scores of VR 93, STM 81, A/VR 87, QR 108, and composite 91. Performance on the Wechsler Individual Achievement Test showed plaintiff to perform at the kindergarten level in math and spelling. Behavioral observations showed plaintiff to be off task twenty-nine percent of the time, significantly impacting his classroom performance. It was noted that deficits in plaintiff's basic psychological processing and educational performance resulted in markedly atypical academic behaviors. (Tr. 175-90.)

An Individual Education Plan (IEP) dated December 2002 noted that plaintiff would be provided services for his learning disabilities in the areas of basic reading, reading comprehension, math calculations, and language impairment. It was noted that plaintiff had either met or made progress toward the

goals set in the December 2001 IEP.  It was determined that plaintiff would spend less than twenty-one percent of his time outside the regular classroom environment.  (Tr. 346-62.)

In January 2003, plaintiff's fourth grade teachers completed a Teacher Questionnaire for disability determinations in which they reported plaintiff to have very serious problems in the domain of Acquiring and Using Information; serious to very serious problems in the domain of Attending and Completing Tasks; obvious to serious problems in the domain of Interacting and Relating with Others, necessitating the implementation of behavior modification strategies; very serious problems in the domain of Moving About and Manipulating Objects; and obvious to serious problems in the domain of Caring for Himself.  It was noted that plaintiff took no medications.  (Tr. 303-10.)

In April 2007, while plaintiff was in the eighth grade, he scored Below Basic on the Missouri Assessment Program testing in math and communication arts.  (Tr. 228.)

An IEP dated September 2009 showed plaintiff to received special education services in math, reading, and language.  Plaintiff was in the eleventh grade.  It was noted that plaintiff had been diagnosed with attention deficit disorder.  Plaintiff reported an interest in participating in post-secondary training in the field of auto technology.  It was noted that plaintiff's disabilities may affect his ability to reach

this goal with challenges getting to class on time, maintaining an appropriate grade point average, and asking for accommodations.  It was also noted that plaintiff's disability may affect his goal of living independently with challenges in banking, paying bills, and budgeting.  Plaintiff's strengths were noted to include positive peer and adult interactions.  (Tr. 170-73.)  An IEP dated September 2010 noted no change in plaintiff's diagnoses or accommodations.  Plaintiff's strengths in this IEP were noted to include strong task focus, strong work ethic, positive attitude, and positive peer and adult interactions.  (Tr. 237-40.)

Disciplinary reports from Hazelwood Central High School dated November 2008 through May 2010 showed disciplinary action to have been imposed upon plaintiff on twenty-five occasions for infractions such as tardiness (eleven infractions), violation of cell phone policy (six infractions), truancy (three infractions), and insubordination (four infractions).

B.    Medical and Other Records

On February 21, 2003, plaintiff underwent a psychological evaluation for disability determinations.  Plaintiff was ten years of age and in the fourth grade. Dr. Robert N. Harris noted plaintiff to have been previously diagnosed with ADHD and to have taken Ritalin with some improvement, but that he stopped the medication because of persistent headaches and lightheadedness.  Dr. Harris noted plaintiff to be restless and impulsive during the examination and to exhibit

symptoms of anxiety.  Plaintiff reported occasionally being bullied at school and that he had been punished for retaliating.  It was noted that plaintiff received occasional detentions for disturbing the class but did not have any significant behavior problems.  As to social functioning, it was noted that plaintiff reportedly had several friends with whom he played nearly every day, played sports and computer games, watched television, and had close relationships with relatives.  As to adaptive limitations, a mild impairment was noted with plaintiff's reported ability to perform chores and maintain adequate personal hygiene with some reminders.  It was noted that plaintiff could not make change or read a non-digital clock.  It was noted that plaintiff had difficulty hearing the examiner, turning his right ear toward the examiner so that he could better hear.  Plaintiff's fine motor skills were noted to be impaired with his handwriting being difficult to read.  Mental status examination showed plaintiff's eye contact to be good and his mood ranged from anxious to positive.  Pronounced anxiety was noted at the beginning of the evaluation.  Plaintiff's mood, affect, and facial expressions were appropriate, and he was noted to be friendly and cooperative.  Plaintiff displayed good hygiene, grooming, and health.  Mild to moderate difficulties were noted in sustained attention, with concentration waning after two minutes on a task.  Plaintiff's memory and judgment appeared unimpaired.  Plaintiff's fund of knowledge was adequate.  It was noted that plaintiff's receptive language skills were unimpaired

but that his expressive language skills were mildly to moderately impaired. Dr. Harris diagnosed plaintiff with generalized anxiety disorder and expressive language disorder and assigned a Global Assessment of Functioning (GAF) score of 69.[1] (Tr. 320-25.)

Plaintiff visited a physician on July 13, 2005, who noted that plaintiff's reported headaches had improved and that he was not taking medication for ADHD. Complete loss of hearing was noted in the left ear. Physical examination was within normal limits. Plaintiff reported that he played basketball at a friend's house. The physician noted plaintiff to be cooperative and to have good language. Plaintiff was diagnosed with hearing loss in the left ear, ADHD-anxious, and static encephalopathy. (Tr. 381.)

On April 14, 2008, plaintiff visited Dr. Keiko Hirose, a pediatric otolaryngologist, upon referral from Dr. Anita Stiffelman. Plaintiff reported having "noise in the head" for about two weeks. It was noted that plaintiff had recently been seen in the emergency room for increased tinnitus. Dr. Hirose removed impacted wax from the right ear, about which plaintiff was noted to be anxious and nervous. An audiogram was within normal limits for the right ear and

---

[1] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34* (4th ed. 2000). A GAF score of 61 to 70 indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

showed mild sloping to profound sensorineural hearing loss in the left ear.

Plaintiff was instructed to return in one year and to avoid even minor head trauma.

(Tr. 375-79.)

Plaintiff visited Dr. April Tyus on September 18, 2008, who noted plaintiff to have chronic hearing loss in the left ear and mild cerebral palsy. It was noted that plaintiff was in the tenth grade, had a lot of friends, and played basketball and football. Physical examination was within normal limits. Audiogram testing showed complete hearing loss in the left ear. Plaintiff was instructed to follow up in one year or as needed. (Tr. 382-83.)

During physical examinations on January 27, February 17, and April 29, 2010, Dr. Akin Fatoki noted plaintiff's right ear to be impacted with wax. (Tr. 401, 403, 404.)

On July 5, 2010, Dr. Anita Stiffelman completed a questionnaire for disability determinations regarding plaintiff's hearing loss. Dr. Stiffelman reported that plaintiff could hear and understand normal conversational speech if it occurred on the right side and not in an excessively distracting environment. Dr. Stiffelman also noted plaintiff to have been diagnosed with ADHD and mild cerebral palsy. Dr. Stiffelman noted plaintiff not to be prescribed any medications. With respect to plaintiff's ability to perform work-related activities, Dr. Stiffelman opined that plaintiff would need an occupational assessment given some issues with hearing

and anxiety.  Noting plaintiff's cerebral palsy to be mild, Dr. Stiffelman reported

that his gross motor functions were within normal limits.  (Tr. 370-71.)

On July 29, 2010, plaintiff reported to Dr. Fatoki that he was doing well.

Plaintiff's ears were noted to be clogged again.  Physical examination was

otherwise normal.  (Tr. 392-93.)

Plaintiff underwent a psychological evaluation on August 21, 2010, for

disability determinations.  Plaintiff's chief complaints were noted to be ADHD and

hearing loss in the left ear.  Plaintiff also reported having anxiety related to his

ability to verbally perform in front of his peers.  Dr. Laura R. Tishey noted that

plaintiff appeared able to hear and understand throughout the evaluation.  Mental

status examination showed plaintiff to have good hygiene and grooming.  Plaintiff

was cooperative and pleasant.  Dr. Tishey noted plaintiff's facial expressions to be

dull, but he had good eye contact.  Plaintiff was coherent, relevant, and logical but

generated no spontaneous interaction.  No problems were noted with stream of

speech and mental activity.  Plaintiff was fully oriented.  Plaintiff was administered

the WAIS-IV, from which Dr. Tishey determined plaintiff's working memory,

concentration, and attention to be poor.  Remote memory appeared intact.  On the

WAIS-IV, plaintiff obtained the following scores, determined by Dr. Tishey to be

valid:  verbal 72, perceptual reasoning 67, working memory 71, processing speed

79, and full scale IQ 67.  Dr. Tishey reported that such scores placed plaintiff in the

extremely low range of intellectual functioning, often seen in persons diagnosed with mild mental retardation. Dr. Tishey opined that plaintiff's adaptive functioning was currently poor to fair and warranted such a diagnosis. Dr. Tishey diagnosed plaintiff with anxiety disorder and mild mental retardation and assigned a GAF score of 60.[2]  (Tr. 407-12.)

On October 5, 2010, Dr. Kenneth Burstin, a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form (PRTF) in which he opined that plaintiff's ADHD, learning disability versus borderline intellectual functioning, and anxiety disorder caused moderate limitations in activities of daily living; maintaining social functioning; and in concentration, persistence, or pace; and resulted in no repeated episodes of decompensation.  (Tr. 413-24.)  In a Mental RFC Assessment completed that same date, Dr. Burstin opined that plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, but was otherwise not significantly limited in the domains of Understanding and Memory and Sustained Concentration and Persistence.  In the domain of Social Interaction, Dr. Burstin opined that plaintiff was moderately limited in his ability to interact appropriately with the general public, but was otherwise not significantly limited.  Dr. Burstin

---

[2] A GAF score of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

further opined that plaintiff was not significantly limited in the domain of Adaptation. Dr. Burstin concluded that plaintiff retained the capacity to acquire and retain at least simple instructions and to sustain concentration and persistence with at least simple, repetitive tasks; and further, could relate adequately to others in settings which did not require frequent public contact or unusually close interaction with others in the workplace. Finally, Dr. Burstin opined that plaintiff could adapt to changes in non-complex work environments. ( Tr. 425-27.)

Plaintiff returned to Dr. Fatoki on October 19, 2010, and complained of having wax in his ears for three months. Examination showed plaintiff to be in no acute distress. Plaintiff's affect was noted to be normal and appropriate. Wax was removed from the ears, and plaintiff was instructed to follow up in three months. (Tr. 429.)

On November 17, 2010, Dr. Aine Kresheck, a psychological consultant with disability determinations, completed a PRTF in which she opined that plaintiff's ADHD, learning disability, mental retardation, and anxiety disorder caused mild limitations in activities of daily living and in maintaining social functioning; moderate limitations in concentration, persistence, or pace; and resulted in no repeated episodes of decompensation. Dr. Kresheck opined that plaintiff's adaptive functioning was consistent with learning disability rather than the IQ scores that placed him in the mental retardation range. (Tr. 447-57.) In a Mental

RFC Assessment completed that same date, Dr. Kresheck opined that plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, and in his ability to maintain attention and concentration for extended periods, but was otherwise not significantly limited in the domains of Understanding and Memory and Sustained Concentration and Persistence. In the domain of Social Interaction, Dr. Kresheck opined that plaintiff experienced no significant limitations. Dr. Kresheck further opined that plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, but otherwise was not significantly limited in the domain of Adaptation. Dr. Kresheck concluded that plaintiff retained the capacity to perform at least one-to-two-step instructions. (Tr. 458-60.)

In a case analysis dated November 30, 2010, Dr. Isabel Moore, a medical consultant with disability determinations, opined that plaintiff's hearing impairment was not severe inasmuch as plaintiff had normal hearing in the non-affected ear. (Tr. 461.)

Plaintiff visited Dr. Fatoki on January 13, 2011, with complaints of having clogged ears for three weeks. Dr. Fatoki removed ear wax and prescribed Atarax for anxiety. Plaintiff was instructed to return in six months. (Tr. 471.)

Between March and September 2011, plaintiff visited Dr. Fatoki on three occasions in relation to general health matters, including complaints of having

clogged ears.  During each of these visits, plaintiff's affect was noted to be normal

and appropriate.  (Tr. 467-69.)

C.    <u>Third Party Observations</u>

On July 8, 2010, plaintiff's sister, Allycia M. Faint, completed a Third Party

Function Report for disability determinations in which she reported that she lived

with plaintiff and attended church with him.  Ms. Faint reported that plaintiff

participates in school and church, performs chores, socializes, dates, watches

television, and plays television games.  Ms. Faint reported that plaintiff also cares

for his dog, which includes walking, feeding, and cleaning the dog.  Ms. Faint

reported plaintiff to have no problems getting along with others, including

authority figures.  Ms. Faint reported that plaintiff's sleep is sometimes affected

because of his nervousness or breathing problems.  Ms. Faint reported that plaintiff

has no problems with personal care and needs no reminding to take care of

personal needs or grooming, but needs reminders to take medication.  Ms. Faint

reported that plaintiff prepares his own meals daily, which sometimes consists of

fast food and frozen dinners.  Ms. Faint reported that plaintiff does laundry, cleans

his room, and mows the lawn and sometimes needs help or encouragement to do

so.  Ms. Faint reported that plaintiff goes out daily and either walks, drives, or rides

in a car when he does so.  Ms. Faint reported that plaintiff drives and can go out

alone.  Ms. Faint reported that plaintiff goes to stores to shop but is unable to pay

bills, handle a savings account, or use a checkbook or money orders. Ms. Faint reported that plaintiff can count change. Ms. Faint reported that plaintiff has a short attention span and has problems following written and spoken instructions. Ms. Faint reported that plaintiff poorly handles stress or changes in routine because of nervousness. Ms. Faint reported that plaintiff's impairments affect his ability to understand, talk, hear, see, complete tasks, get along with others, remember, and concentrate. (Tr. 214-21.)

## IV. The ALJ's Decision

The ALJ found that plaintiff was most recently determined disabled on March 6, 2003, because of his medically determinable severe impairments of anxiety disorder and learning disorder that functionally equaled a listed impairment. The ALJ also found that plaintiff did not develop any additional impairments between March 6, 2003, and October 7, 2010, and thus that plaintiff's current impairments were the same as those determined on March 6, 2003. The ALJ found that since October 7, 2010, plaintiff's impairments, either singly or in combination, did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ thus determined that medical improvement had occurred as of October 7, 2010, and that such improvement related to the ability to work inasmuch as plaintiff's impairments no longer equaled the same listed impairment. The ALJ determined plaintiff's anxiety disorder and

learning impairment to continue to be severe.  (Tr. 11-14.)  The ALJ found that,

beginning on October 7, 2010, plaintiff had the RFC to perform work at all

exertional levels, except that he was "limited to simple, unskilled work and would

be able to relate adequately with others in settings which do not require frequent

public contact or unusually close interaction with others in the workplace."  (Tr.

14.)  The ALJ determined plaintiff not to have any past relevant work.

Considering plaintiff's age, education, work experience, and RFC, the ALJ found

that vocational expert testimony supported a finding that plaintiff could perform

work as a packer/wrapper, assembler, sorter, inspector, dishwasher, and cleaner

and that such jobs existed at the numbers as testified by the vocational expert,

which constituted significant numbers in the national economy.  The ALJ thus

found that plaintiff's disability ended on October 7, 2010, and that plaintiff had not

become disabled since that date.  (Tr. 14-19.)

## V.  Discussion

For claimants previously determined to be under a disability and thus

awarded disability benefits, the SSA conducts continuing disability reviews to

determine whether or not the claimant continues to meet the disability

requirements of the law.  20 C.F.R. § 416.990(a).  Such continuing disability

reviews are conducted for persons who are found to be disabled as adults, 20

C.F.R. § 416.994, and for persons who are found to be disabled as children, 20

C.F.R. § 416.994a.  The critical question in such a review is whether the claimant's condition has improved since the prior award of disability benefits and, if so, whether such medical improvement is related to the claimant's ability to work.  20 C.F.R. § 416.994(b)(2)-(5); *see also Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991) (per curiam).

In cases where, as here, a claimant who was awarded disability benefits as a child attains eighteen years of age, the SSA does not undergo a continuing disability review under § 416.994 but instead redetermines the claimant's eligibility for benefits.  20 C.F.R. § 416.987.  The rules used for these "age-18 redeterminations" are those applicable to adult claimants who file new applications for benefits, that is, the rules set out in 20 C.F.R. § 416.920(c)-(g).  *See* 20 C.F.R. § 416.987(b).  "[W]e will not use the rules in § 416.994 for determining whether disability continues."  *Id.*  Accordingly, the framework used by the Commissioner in age-18 redetermination cases is that familiar five-step sequential analysis for reviewing new adult applications for disability, except that whether the claimant is engaged in substantial gainful activity is not considered.  *Id.*

In such cases, therefore, the Commissioner first determines whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then

determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the next step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.  20 C.F.R. § 416.920(c)-(g).  Throughout all steps of the process, the claimant retains the burden of demonstrating that he is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  With age-18 redeterminations, the Commissioner may find a claimant to not be disabled even though there was a previous finding of disability as a child.  20 C.F.R. § 416.987(a)(2).

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even

though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

As an initial matter, the undersigned notes that the ALJ expressly and repeatedly invoked 20 C.F.R. § 416.994 in his decision and applied its seven-step analysis applicable to cases of continuing disability review. Given that age-18 redeterminations are governed by 20 C.F.R. § 416.987, and that § 416.987 explicitly prohibits the use of § 416.994 in such redeterminations, the ALJ's use of the rules in § 416.994 to find plaintiff to no longer be disabled was error. However, in his discussion, the ALJ also applied the substance of the rules set out in § 416.920(c)-(g) that are used for adult claimants who file new applications. Because such process complies with the dictates of 20 C.F.R. § 416.987 in age-18 redeterminations, the ALJ's superfluous use of § 416.994 in finding plaintiff not to be disabled was harmless.

The Court turns now to plaintiff's specific challenges to the ALJ's decision.

A.    Listing 12.05(C), Mental Retardation

Plaintiff claims that the ALJ erred when he failed to find that his cognitive impairments met Listing 12.05(C) – Mental Retardation.  Specifically, plaintiff argues that the ALJ erred by finding that plaintiff suffered no deficits in adaptive functioning, by discounting recent IQ scores, and by failing to consider his anxiety disorder as another impairment imposing significant limitations.  For the following reasons, the ALJ did not err.

Listing 12.05 states, in relevant part:

Mental retardation:  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05.  To meet Listing 12.05(C), a claimant's impairment must satisfy the diagnostic description in the introductory paragraph of Listing 12.05 <u>and</u> the criteria in paragraph (C).  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00; *see also Maresh v. Barnhart*, 438 F.3d 897, 899 (8th

Cir. 2006) (impairment must satisfy diagnostic description in the introductory paragraph).

Assuming *arguendo* that plaintiff had valid IQ scores that met the first prong of Listing 12.05(C) and another mental impairment that imposed additional and significant work-related limitations of function, the ALJ nevertheless properly found plaintiff not to suffer deficits in adaptive functioning to bring his impairment within the diagnostic criteria of mental retardation as set out in the introductory paragraph of 12.05. The ALJ therefore did not err in failing to find plaintiff's impairment to meet Listing 12.05(C).

The claimant bears the burden to establish that he meets all of the criteria of a listed impairment. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). To meet the criteria of mental retardation as described in Listing 12.05, plaintiff must demonstrate that he suffers "deficits in adaptive functioning." *Maresh*, 438 F.3d at 899 (requirements in introductory paragraph are mandatory); *Cheatum v. Astrue*, 388 Fed. Appx. 574, 576 (8th Cir. 2010) (per curiam) (requirements include showing deficits in adaptive functioning). Notably, Listing 12.05 does not expressly define "deficits in adaptive functioning." While the SSA has cautioned against restricting its definition to one used by professional organizations for diagnostic purposes alone – such as the definition set out in the Diagnostic and Statistical Manual of Mental Disorders (DSM) – it nevertheless allows the use of

professional organizations to assist the Commissioner in determining whether the necessary elements of mental retardation have been established under the Regulations.[3] *See* 67 Fed. Reg. 20018-01, at *20022, 2002 WL 661740 (SSA Apr. 24, 2002); *see also Maresh*, 438 F.3d at 899 (noting the Commissioner to have rejected a proposal that the DSM's definition of mental retardation be used for Listing 12.05).

The ALJ here found plaintiff not to have any deficits in adaptive functioning. In making this finding, the ALJ reviewed all of the evidence of record and specifically noted that plaintiff had obtained his driver's license and continued to drive independently. The ALJ also noted that plaintiff had graduated from high school, was in special education classes for only fifteen percent of the school week, obtained passing grades in somewhat advanced classes such as Geometry and Algebra 2, and was currently enrolled in and independently attending community college classes. The ALJ also noted that while plaintiff's disciplinary record in high school showed tardiness and use of his cell phone in class, there was no record of violence or hostile behavior toward others. The ALJ noted the record to

---

[3] At the time of the ALJ's decision, the DSM-IV-TR was the current publication and defined "adaptive functioning" as referring to "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting," DSM-IV-TR at p. 42; and is measured in the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Id.* at p. 41. The DSM-V, upon which plaintiff relies, was published in May 2013.

show that, indeed, plaintiff was reported to get along well with others and displayed a positive attitude. The ALJ also noted plaintiff to show no deficits with activities of daily living and social interaction, as demonstrated by his independent ability to care for his personal needs, perform chores, care for and train his dog, prepare simple meals, socialize with friends, go shopping at the mall, play games, and date. The ALJ also noted that plaintiff's demeanor at the hearing, as well as observations made by SSA personnel and treating and examining physicians, showed plaintiff to understand and respond appropriately to questions and to display no behavioral limitations. These findings are supported by substantial evidence on the record as a whole and demonstrate that plaintiff's impairments did not result in deficits of adaptive functioning so significant to meet the severity of Listing 12.05. *E.g., Phillips v. Colvin,* 721 F.3d 623, 631-32 (8th Cir. 2013) (evidence that claimant was able to perform personal care needs, household chores, and yard work supported ALJ's finding that impairment did not meet or medically equal Listing 12.05(C)); *Cox v. Astrue,* 495 F.3d 614, 618 (8th Cir. 2007) (evidence that claimant was able to effectively communicate, had successful social relationships, exhibited self-sufficient behavior, and lack of physical problems supported ALJ's finding that impairment did not result in deficits of adaptive functioning that met criteria of Listing 12.05); *Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004) (passing driver's license test, driving a car, and attending

regular classes in high school inconsistent with Listing 12.05 criteria).

Even assuming that plaintiff's recent IQ scores and anxiety disorder place him within the criteria of paragraph (C) of Listing 12.05, the ALJ is nevertheless required to examine the full record to determine whether plaintiff experiences the types of deficits in adaptive functioning necessary to meet the criteria set out in 12.05's introductory paragraph. *Maresh,* 438 F.3d at 899*; cf. Miles*, 374 F.3d at 700. This is precisely what the ALJ did here, and his finding that plaintiff's impairments did not meet this criteria was supported by substantial evidence on the record as a whole. Accordingly, the ALJ did not err in finding that plaintiff's impairment did not meet or medically equal Listing 12.05(C).

B.     Hearing Impairment

Plaintiff claims that the ALJ erred by failing to consider his hearing impairment to be a severe impairment and by failing to include any hearing limitations in his RFC.

Where an ALJ errs by failing to find an impairment to be severe, such error is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process. *See Coleman v. Astrue*, No. 4:11CV2131 CDP, 2013 WL 665084, at *10 (E.D. Mo. Feb. 23, 2013). Here, the ALJ found plaintiff to have severe impairments, and specifically anxiety disorder and learning

impairment, but found plaintiff's hearing impairment not to be severe. (Tr. 14.)

Continuing in the evaluation process, the ALJ nevertheless considered the effect of

plaintiff's hearing loss and indeed included it in the hypothetical question posed to

the vocational expert, the answer to which the ALJ relied upon in his final

determination. Given the ALJ's inclusion of plaintiff's hearing impairment in his

overall analysis, the failure to find the condition to be a severe impairment was

harmless. *See Maziarz v. Secretary of Health & Human Servs.,* 837 F.2d 240, 244

(6th Cir. 1987); *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010);

*see also Chavez v. Astrue*, 699 F. Supp. 2d 1125, 1133 (C.D. Cal. 2009).

To the extent plaintiff claims that the ALJ erred in failing to include the

effects of his hearing impairment in the RFC determination, the Court finds such

failure to likewise be harmless inasmuch as it did not affect the outcome of the

case. At the administrative hearing, the ALJ asked the vocational expert to

consider an individual who, *inter alia*, had hearing loss in one ear, good hearing in

the other ear, would probably have problems hearing things if people were behind

him speaking or if there were noises behind him, but could hear things adequately

if he was in front of a person. The vocational expert testified that the occupational

base would be reduced by such limitations, but that such a person could perform

work. The expert then provided a list of jobs that could be performed by persons

with these hearing limitations, as well as the number of such jobs in existence in

the region.  In his final decision, the ALJ relied upon this particular testimony –

including the specific jobs and related numbers – to find plaintiff not disabled.  As

such, while the ALJ did not include the effects of plaintiff's hearing loss in the

*written* RFC determination, his limitations therefrom were nevertheless included in

the ALJ's finding that plaintiff could perform work as it exists in significant

numbers in the national economy given that it was based upon the vocational

expert's testimony that considered these limitations.  Because there is no indication

that the ALJ would have decided differently had he included plaintiff's hearing

limitations in the written RFC determination, any error by the ALJ in this regard

was harmless.  *See Van Vickle v. Astrue*, 539 F.3d 825, 830-31 (8th Cir. 2008).

Finally, the undersigned notes that the hearing limitations included in the

hypothetical are consistent with Dr. Stiffelman's July 2010 report that plaintiff

could hear and understand normal conversational speech if it occurred on the right

side and not in an excessively distracting environment.  Given the ALJ's inclusion

of these limitations in his hypothetical and his ultimate finding that plaintiff could

perform work with such limitations, "it is highly unlikely" that the ALJ failed to

consider Dr. Stiffelman's report in determining plaintiff's limitations.  *Black v.

Apfel*, 143 F.3d 383, 386 (8th Cir. 1998).  Plaintiff's claim otherwise is without

merit.  The mere failure to cite to specific evidence does not indicate that such

evidence was not considered.  *Id.*

C.    RFC Determination

Plaintiff claims that the ALJ erred in his RFC determination by failing to include limitations relating to plaintiff's deficits in concentration, persistence, or pace and by failing to include limitations as identified by plaintiff's sister in the Third  Party Function Report.  For the following reasons, plaintiff's claims fail.

1.    *Concentration, Persistence, or Pace*

In their PRTFs, both State agency consultants opined that plaintiff experienced moderate limitations in concentration, persistence, or pace, and the ALJ agreed with these determinations.  (Tr. 12-13.)  In his RFC assessment, the ALJ limited plaintiff to the performance of simple, unskilled work but included no additional limitations with respect to concentration, persistence, or pace.  Plaintiff claims that the ALJ's failure to include such additional limitations was error.

In *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996), the ALJ found the claimant to often have limitations in concentration, persistence, or pace but found him capable of maintaining concentration and attention for simple work.  In his hypothetical question to a vocational expert, the ALJ included a limitation to simple work but included no additional limitations relating to concentration, persistence, or pace.  The Eighth Circuit reversed, finding the evidence to show plaintiff's deficiencies in concentration, persistence, and pace to include

moderate deficiencies in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal work week, and perform at a consistent pace without an unreasonable number and length of rest periods[; and] marked[] limit[ations] in his ability to carry out detailed instructions[.]

*Id.* at 695.  The Eighth Circuit determined that because the hypothetical question omitted such evidence relating to claimant's deficiencies in concentration, persistence, or pace, it could not be said that the expert's opinion was based on the full extent of the claimant's limitations.  *Id.*

Here, unlike in *Newton*, the evidence does not show plaintiff's deficiencies in concentration, persistence, or pace to be so limiting.  Indeed, both State agency consultants detailed in their Mental RFC Assessments that, in the domain of Sustained Concentration and Persistence, plaintiff experienced no significant limitations in his ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary work routine without special supervision; to work in coordination with or proximity to others without being distracted by them; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 425-26, 458-

59.)[4]  To the extent plaintiff was considered to have moderate limitations in this

domain, both consultants opined that plaintiff was moderately limited in his ability

to carry out detailed instructions, and Dr. Kresheck further opined that plaintiff

was moderately limited in his ability to maintain attention and concentration for

extended periods.[5]  (*Id.*)  No other moderate limitations in this domain are noted.

Accordingly, because substantial evidence shows plaintiff's limitations in

concentration, persistence, or pace did not impose limitations beyond the

performance of simple, unskilled work, the ALJ did not err in his RFC

determination or in his hypothetical to the vocational expert that included only this

relevant limitation.

2.    *Third Party Observations*

Plaintiff claims that the ALJ erred by failing to include in his RFC

determination the limitations observed by plaintiff's sister with respect to

plaintiff's short attention span, poor ability to handle stress and changes in routine,

and his ability to complete tasks.  Plaintiff claims that, because the ALJ relied on

other portions of Ms. Faint's function report to support his adverse determination,

---

[4] The ALJ accorded great weight to the opinions of these State agency consultants.  (Tr. 17.)
Plaintiff does not challenge this determination.

[5] Dr. Burstin, on the other hand, found plaintiff to have no significant limitations with attention
and concentration.  (Tr. 425.)

he should have either adopted the report in its entirety or provided sufficient reasons to discount the portions of the report he failed to address.

Where an ALJ identifies and considers evidence relating to a claimant's impairment and then does not include alleged limitations caused thereby in a detailed RFC, it is reasonable to conclude that the ALJ implicitly found no significant limitations. *See McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). *See also Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011); *Hilkemeyer v. Barnhart*, 380 F.3d 441, 447 (8th Cir. 2004); *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998). Although the ALJ did not explicitly "list and reject" the additional limitations as observed by plaintiff's sister in her function report, such a task is not required. *See McCoy*, 648 F.3d at 615. The ALJ therefore did not err in his consideration of Ms. Faint's function report.

## VI. Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled is supported by substantial evidence on the record as a whole, and plaintiff's claims of error are denied.

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 18th day of June, 2014.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE